**Alvin LUCAS, on behalf of himself and all others similarly situated, Plaintiff-Appellant,**

**v.**

**WISCONSIN ELECTRIC POWER COM-PANY, a Wisconsin public utility company, et al., Defendants-Appellees.**

**No. 71-1113.**

United States Court of Appeals, Seventh Circuit.

Argued En Banc May 24, 1972.*

Decided Aug. 2, 1972.

Certiorari Denied Jan. 8, 1973. See 93 S.Ct. 928.

---

* This case was originally heard on January 20, 1972, before a panel of this court consisting of Senior Circuit Judge Knoch, Circuit Judge Sprecher, and Chief District Judge Robert A. Grant of the Northern District of Indiana, sitting by designation. It was subsequently set for rehearing en banc.

Mark E. Wilson, Milwaukee, Wis., for plaintiff-appellant.

Robert H. Gorske, Milwaukee, Wis., Robert W. Warren, Atty. Gen., Madison, Wis., Paul Rodgers, Gen. Counsel, Ray M. Druley, Deputy Asst. Gen. Counsel, National Assoc. Regulatory Utility Comnrs., Washington, D. C., for defendants-appellees.

Before SWYGERT, Chief Judge, KNOCH, Senior Circuit Judge, KILEY, FAIRCHILD, CUMMINGS, PELL, STEVENS and SPRECHER, Circuit Judges.

STEVENS, Circuit Judge.

This appeal arises out of a dispute over plaintiff's monthly billing of $9.89 for residential electric service for November, 1969. The question presented is whether the Power Company's proposed method of resolving the dispute—by terminating plaintiff's service unless the disputed bill is paid within five days—is proscribed by § 1 of the Civil Rights Act of 1871, 17 Stat. 13, now 42 U.S.C. § 1983.[1] The statute protects

---

[1]. Although there were minor changes in the language of the statute when it was codified as § 1979 of the Revised Statutes of 1874–1878, it has thereafter remained unchanged. It now reads:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

the plaintiff from deprivation of his federal constitutional rights by a defendant acting "under color of any statute, ordinance, regulation, custom, or usage" of the State of Wisconsin.

Because the defendant proposes to act before the dispute has been resolved, plaintiff contends that he will be deprived of liberty or property without due process of law;[2] because the proposed termination is consistent with disconnect rules which have been approved by the Wisconsin Public Service Commission, he contends that the Power Company's threat is made "under color of" state law. We shall consider both contentions after describing the background of this particular dispute and the Power Company's disconnect procedures as approved by the Wisconsin Commission.

## I.

Plaintiff is one of the 599,051 customers of the defendant Wisconsin Electric Power Company. As a representative of that class, and also on his own behalf, he filed a complaint on July 2, 1970, requesting that a three-judge court be convened to enjoin the enforcement of § 113.13(4) of the regulations of the Wisconsin Public Service Commission, and to prevent defendant Power Company from "terminating electrical services for alleged arrearages without prior, adequate notice and hearing."

The complaint alleged that plaintiff had paid his monthly bill in cash on December 23, 1969, but failed to obtain a stamped receipt. Thereafter he paid current charges, but consistently re-fused to pay the alleged arrearage. In due course the Power Company notified him that his service would be disconnected on July 6, 1970.

After filing his complaint on July 2, 1970, plaintiff moved for a temporary restraining order. The parties apparently agreed informally that his service would continue while the litigation was pending.[3] A few days later, plaintiff amended his complaint to join the commissioners of the Wisconsin Public Service Commission as individual defendants. In his amended complaint and in his argument in this court he emphasized the absence of "an impartial decision maker" to resolve the dispute before service could be discontinued.[4]

The defendant commissioners moved to dismiss the complaint on the ground that the relevant provisions of the Wisconsin Administrative Code "do provide due process of law to plaintiff and to all similarly situated." The motion was supported by affidavits describing the commission's disconnect regulations and the rules of the defendant Power Company relating to collections. The affidavits also described both formal and informal procedures which the commission employs to resolve disputes between customers and a regulated utility. The affidavits indicated that the plaintiff had not invoked these procedures.

Every utility is required to furnish reasonably adequate service and to comply with a variety of commission regulations as well as detailed rules which each utility must file with the commission.[5] The commission's rule covering

---

2. "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; * * *." United States Constitution, Amendment XIV.

3. The record discloses no formal action in response to the motion for a temporary restraining order, but a stay requiring service to be continued pending the outcome of this appeal was entered some months later.

4. Although plaintiff apparently objects to the commission's regulation because it does not specifically require a notice to be given as well as because it does not re-quire a hearing, he does not attempt to establish that the five-day notice provided for by the Company's regulation is inadequate. The real gravamen of his complaint as to both the commission and the Company is the failure to require or provide for a prior hearing before an impartial decision maker.

5. We assume, as plaintiff argues, that the state's regulation of the defendant Power Company is "pervasive." As a public utility, Wisconsin Electric Power Company operates under the close and continuing regulation of the Wisconsin Pub-

deposits, guarantees and disconnects (§ 113.13) contains the following provision specifically attacked by plaintiff in this litigation:

"(4) DISCONNECT RULE. (a) Service may be disconnected if a customer's current bill for service as defined in the utility's filed rules is not paid within a reasonable period set forth in said rules."

Pursuant to that rule, the defendant Power Company had filed detailed rules and regulations describing, among other things, its collection procedures. The section applicable to arrearages amounting to between $5 and $20 stated that when collection action is required, the following steps should be taken:

"1. A written notice shall be sent to the customer, stating the amount the customer is in arrears, and notifying him that service will be disconnected if such arrears are not paid within five days.

"2. If the arrears remain unpaid at the end of the period specified on the disconnection notice and satisfactory arrangements for payment have not been made, service may be disconnected without further notice to the customer."

It is the commission's acceptance of these "filed rules" as adequate compliance with § 113.13(4) that plaintiff attacks as unconstitutional.

The affidavit of the Director of the Rates and Research Division of the commission described the manner in which customer complaints involving service, including situations in which a public utility threatens to invoke the disconnect rule for nonpayment, are handled by the commission. Formal complaints may be brought by no less than 25 private citizens. Such a procedure might lead to the modification of a utility's disconnect procedures, but apparently has not been invoked for that purpose. However, affiant received an average of

---

lic Service Commissioners. Relevant regulations are found in chapter 196 of the Wisconsin statutes:

196.02 Powers of the Comm'n

"(1) * * * to supervise and regulate every public utility in this state, and to do all things necessary and convenient in the exercise of such power and jurisdiction. * * *

"(4)(a) * * * inquire into the management of the business of all public utilities * * *.

"(5) * * * the right to inspect the books, accounts, papers, records, and memoranda of any public utility, and to examine under oath, any officer, agent or employee * * * in relation to its business and affairs."

196.03 Service

"(1) Every public utility is required to furnish reasonably adequate service and facilities. * * *"

196.06 Books

The commission can require a uniform system of accounting.

196.12 Reports

The public utility must furnish to the commission a long list of records and accounts.

196.20 Changes

No change in any utility rule which purports to curtail the obligation or undertaking of service of such utility shall be effective without the written approval of the commission after hearing.

196.37 Rates

When the commission feels that rates are unjust, unreasonable, insufficient or unjustly discriminatory, it can fix reasonable rates.

196.60, 196.62 Penalty

These sections provide for penalties for discrimination in rates charged.

196.78 Dissolution

A public utility may not voluntarily dissolve itself, except with the consent of the commission after a hearing.

196.80 Merger

No consolidation or merger of utilities is permitted without approval of the commission.

The Commission's regulations are, of course, much more detailed than the statutory provisions of chapter 196, of which the above are only a sampling. The Company does not challenge the state's power to impose these regulations. Cf. Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77; Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940.

about two informal complaints per week concerning either actual or threatened terminations of service. It was his practice to make a written record of each such complaint and to request the utility to withhold actual disconnection until he could inquire into the relevant facts. The "great bulk of all complaints" was settled by mutual agreement. If no settlement was reached, the affiant indicated that the commission was authorized to initiate a formal investigation. However, he did not describe what had happened to any complaint which was not resolved by an agreement between the customer and the utility.

The defendant Power Company filed an answer to the complaint specifically denying that it received a payment from plaintiff on or about December 23, 1969,[6] and admitting that it had notified plaintiff that his electric service would be discontinued if plaintiff did not comply with the Company's filed rule procedure respecting delinquent accounts. The Company averred that plaintiff had an adequate remedy in the courts of the State of Wisconsin for resolution of the dispute over the alleged nonpayment; that injunctive relief was inappropriate; that the case was not proper either for a declaratory judgment or for a three-judge federal court; denied that plaintiff's claim was typical of a significant definable class; and specifically denied that either § 113.13(4) or the rules which the Power Company had filed with the commission violated plaintiff's rights under the Fourteenth Amendment to the United States Constitution.

Plaintiff propounded detailed interrogatories to the Power Company pertaining to its procedures for resolving disputes with customers and the records relating to plaintiff's specific claim. In response, the defendant identified various Company personnel who handled such complaints and indicated that during 1969, 71 disputes had been presented to persons other than regular Company personnel. Of the total of 71 cases, 33 disputes were presented to the Public Service Commission, 35 to Company officers, 2 to the Better Business Bureau, and 1 to the Milwaukee Journal. The interrogatory answers stated that the number of service terminations for nonpayment of bills in 1968 and 1969, respectively, were 10,691 and 9,970. The answers then described in great detail the Company's billing procedures, the way in which its computers are employed, and stated that no customer billings were corrected in 1969 due to computer errors, although a total of 646 errors due to human agency had been brought to the attention of the Company. Most of the errors resulted either from incorrect meter readings or clerical errors; in all such cases the errors had been corrected when they became known.[7]

The defendant Power Company took plaintiff's deposition. Although his testimony indicated that the accounting discrepancy might have arisen in part because of his move from one address to another in January, or possibly because he had given two monthly receipts to a Power Company clerk who had failed to return them to him in accordance with her promise, we assume

6. Apparently the bill was actually for the latter part of November and first part of December. According to plaintiff's affidavit and deposition testimony, the disputed bill or bills totaled over $18. However, the interrogatories answered by the Company clearly set the arrearage at $9.89, which is apparently all the Company is trying to collect. In any event, our analysis is not affected by the exact amount in dispute.

7. The interrogatory answers also explained the details of plaintiff's consumption of electricity together with an accounting of bills rendered and payments made. The names, addresses, titles and years of service of all 37 employees assigned to receiving payments and performing customer service at the office where plaintiff claims to have paid his bill in December, together with their work schedules, were set forth in great detail.

for present purposes that the factual dispute involves nothing more than the question whether he actually made the cash payment in December, 1969, as alleged in the amended complaint.[8] Plaintiff was employed by the City of Milwaukee at the time the litigation was commenced and, although he subsequently lost his job and was permitted to prosecute this appeal in forma pauperis, he made no claim of inability to pay electrical bills when rendered.

In response to the motion to dismiss, and apparently without relying on any facts developed by affidavits or discovery, the district court dismissed the complaint for failure to state a claim on which relief can be granted and for failure to state a substantial federal question. The court held that the defendant Power Company was a private company whose rights had not been enlarged by the commission regulation which plaintiff challenged. Since the Company did not act on behalf of the state and was given no rights under state law over and above the rights which it possessed under common law, the court held that it was not acting "under color of" state law within the meaning of § 1983. The court held our decision in Kadlec v. Illinois Bell Telephone Co., 7 Cir., 407 F.2d 624, cert. denied, 396 U.S. 846, 90 S.Ct. 90, 24 L.Ed.2d 95, applicable, and Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 distinguishable. In response to the suggestion that neither our decision in Kadlec, nor the district court's analysis of the "state action" issue, gave appropriate effect to Supreme Court decisions such as Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, and Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 we decided to review the case en banc. We reaffirm Kadlec.

## II.

Before discussing the principal issues, it is appropriate to put certain preliminary matters to one side.

■ First, plaintiff's challenge is directed at the practices of only one of several public utilities in the State of Wisconsin. Section 113.13(4) of the Wisconsin Administrative Code is not self-implementing, but rather contemplates further action by each of the utilities subject to its provisions. The rules which the defendant Power Company filed pursuant to that regulation do not have state-wide application and the regulation itself does not foreclose the procedural safeguards which plaintiff requests. We are satisfied, therefore, that a three-judge court should not be convened. See Board of Regents v. New Left Education Project, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697.

Second, we express no opinion on whether this litigation was appropriately commenced as a class action. Manifestly, there is room to doubt whether all of the customers of Wisconsin Electric Power Company would desire the Company to make the changes in its disconnect procedures which plaintiff requests. See Ihrke v. Northern States Power Co., 459 F.2d 566, 572 (8th Cir. 1972). In view of the plaintiff's allegations, however, we assume that plaintiff is a typical customer of the utility.

■ Third, we note that plaintiff, of course, makes no claim that the defendant Power Company has any obligation to provide electric service to anyone who is unable to pay his bills. For purposes of decision, we assume that the defendant's typical customer is solvent and may be required to make a reasonable security deposit as a condition to the initiation or continuation of service. We stress this assumption because in argument before this court plaintiff's counsel suggested that the

---

8. Plaintiff does not allege that the proposed disconnect would be in violation of commission regulations either because he moved to a new location after the dispute arose or because he subsequently paid current bills; it is plaintiff's theory that the proposed disconnect is under color or—not in defiance of—state law.

issues are affected by the fact that plaintiff is now receiving welfare assistance. We reject this suggestion. Although plaintiff's present indigency might be relevant to the question whether it would be reasonable for the utility to extend him further credit, it cannot control our analysis of a procedure which is designed to treat 599,051 paying customers with an even hand.[9]

We should also note that we do not believe the outcome of this litigation, particularly since plaintiff purports to act in a representative capacity, may turn on the plaintiff's lack of understanding of the remedies available to him. Although he indicated in his deposition that he is unable to read or write, and that he was neither advised nor knew that he might seek the assistance of the Wisconsin Public Service Commission in attempting to resolve his dispute, he affirmatively alleged that he is an adequate representative of the entire class of customers. For purposes of testing the sufficiency of his claim, he must be presumed to have had the same knowledge of the law as any other citizen. Whether the action be considered as an individual action or as a class action, it is apparent that the unique disability of a particular recipient of a formal notice cannot be the measure of its constitutional adequacy.[10]

Finally, we note that our disposition of the case avoids the necessity for considering the possible applicability of the Johnson Act, 28 U.S.C. § 1342, and the troublesome question of whether decisions such as Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002, would require a federal court to abstain when requested to review the validity of state administrative action.

We turn to the merits.

### III.

The amended complaint was dismissed because the district court, 322 F.Supp. 337, concluded that there was insufficient "state involvement" on which to predicate federal jurisdiction. Defendants argue that in any event plaintiff has not been denied "due process." The case is thus argued as though it presented a "state action" issue and a "due process" issue. Because of the confusion that the "state action" concept has generated,[11] however, it is useful to identify two different reasons for analyzing a state's participation in challenged conduct; one reason is constitutional and the other statutory.

The Fourteenth Amendment is a prohibition against certain types of conduct by a state. It contains no self-executing prohibition against private discriminatory conduct, or against procedures by which one private citizen may deal unfairly with another. For a plaintiff to invoke the Fourteenth

---

9. Indeed, the Supreme Court has explicitly recognized the importance of requiring all customers of a regulated public utility to pay their bills promptly in order to forestall discrimination. Midstate Horticultural Co., Inc. v. Pennsylvania Railroad Co., 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96.

10. "The fact that its opportunity for a hearing was lost because misapprehension as to the appropriate remedy was not removed by judicial decision until it was too late to rectify the error, does not furnish the basis for a claim that due process of law has been denied. Compare O'Neil v. Northern Colorado Irrigation Co., 242 U.S. 20, 26, 37 S.Ct. 7, 61 L.Ed. 123." American Surety Co. v. Baldwin, 287

U.S. 156, 169, 53 S.Ct. 98, 102, 77 L.Ed. 231.

11. "Only by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45.
Later the Court noted that "readily applicable formulae may not be fashioned" and that the very "largeness" of government, involving "a multitude of relationships" requires us to remember that conclusions respecting state leasing agreements "can be determined only in the framework of the peculiar facts or circumstances present." Id. at 725–726, 81 S.Ct. at 861–862.

Amendment, he must establish that his rights have been impaired by a state.[12] Thus, in this case, the issue identified by the "due process" label is whether the State of Wisconsin has deprived plaintiff of his liberty or property without due process of law.

■ The statutory language provides a separate reason for considering the state's relationship to the alleged wrong. Section 1983 is inapplicable unless the defendant has acted "under color of" state law, custom or usage. Whereas the primary focus of the constitutional prohibition is upon the action of the state, the statutory prohibition encompasses private conduct, the effectiveness of which is in part attributable to the fact that it derives support, or at least the appearance of validity, from a state law or custom. Neither Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, nor Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S. Ct. 813, 96 L.Ed. 1068, arose under § 1983 or involved a consideration of when private conduct is "under color of" state law within the meaning of that statute. Conversely, Kadlec v. Illinois Bell Telephone Co., 7 Cir., 407 F.2d 624,

cert. denied, 396 U.S. 846, 90 S.Ct. 90, 24 L.Ed.2d 95, relied exclusively on the interpretation of § 1983 and did not decide any constitutional issue. Instead, therefore, of accepting the parties' invitation to consider the issues simply in terms of, first, "state action" and, second, "due process," we believe our holding will be more precise if we discuss (a) the claim against the commissioners and then (b) the claim against the Power Company.

■ It is a violation of the Fourteenth Amendment for a state to deprive any person of "life, liberty, or property without due process of law."[13] When the defendant commissioners act in their official capacity they unquestionably act "under color of" state law within the meaning of § 1983; we therefore need not concern ourselves with the statutory issue in the case against the commissioners. The real question as to the commissioners is constitutional—whether on behalf of the State of Wisconsin they have deprived plaintiff of due process of law. As to the Power Company, however, we need not reach any constitutional issue unless a statutory hurdle is first overcome. The statutory question is whether the

12. "It is clear, as it always has been since the Civil Rights Cases [109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835], that 'Individual invasion of individual rights is not the subject matter of the amendment,' [Id.] at p. 11, 3 S.Ct. at page 21, and that private conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it." *Id.* at 722, 81 S.Ct. at 860.

See also Moose Lodge v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Dombrowski v. Dowling, 459 F.2d 190, 194–196 (7th Cir. 1972).

13. The due process requirement applies, of course, "only to the deprivation of an interest encompassed within the Fourteenth Amendment's protection." Fuentes v. Shevin, 407 U.S. 67, 84, 92 S.Ct. 1983, 1996, 32 L.Ed.2d 556 (1972). The Court's analysis of the question in *Fuentes, id.* at 84–90, 92 S.Ct. 1996–1999, suggests that plaintiff's interest in receiving electric service is protected by the Fourteenth Amendment. Citing Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90, and Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287, the Court reiterated that statutory entitlements are interests so protected. The Wisconsin statutory scheme, see Wis.Stat.Anno., chapter 196 and especially §§ 196.03 and 196.22, indicates that a public utility must furnish adequate service at nondiscriminatory rates to everyone within its area of service who pays the prescribed reasonable charges and complies with all other necessary and reasonable rules. The theory that a public utility cannot unjustifiably refuse service is not new. See, *e. g.,* Shepard v. Milwaukee Gas Light Co., 15 Wis. 318 (1862) (1873 reprint at p. 349). Thus, we assume, without deciding, that plaintiff's interest in continued electric service is protected by the Fourteenth Amendment.

Company acts "under color of" state law when it disconnects service. If not, it does not violate § 1983 even if its conduct would otherwise deprive plaintiff of a federal right.

We shall therefore first direct our attention to the claim that the Constitution requires that the defendant commissioners be enjoined from enforcing, or be required to modify, § 113.13(4) of the Wisconsin Administrative Code and then consider whether the proposed action of the defendant Power Company is "under color of" state law within the meaning of § 1983.

A.

When the defendant commissioners, or their predecessors, adopted § 113.13(4), and later when they accepted the Power Company's five-day notice rule as conforming thereto, they were, of course, acting for the state. Unquestionably, therefore, this case involves "state action." [14] But the right which plaintiff seeks to vindicate in this litigation was not abridged in the slightest by that action. To grant plaintiff's request for a judgment declaring

§ 113.13(4) invalid, or to enjoin defendant commissioners from enforcing it, would merely remove a restriction on the utility's freedom.[15] The action of the state which plaintiff seeks to restrain has neither enhanced the Company's powers nor diminished plaintiff's rights. The "state action" in *promulgating* § 113.13(4) of the regulations did not deny plaintiff due process of law.

What plaintiff really seeks is not an injunction against the state's action, but an affirmative command that it act more effectively. In essence, he contends that there is state inaction in the face of circumstances which are constitutionally intolerable. It is by no means clear that "state inaction" is equivalent to "state action" for Fourteenth Amendment purposes. Obviously, a state does not violate the Fourteenth Amendment by failing to enact into law the programs or policy judgments advocated by any particular citizen or group. We assume, however, without deciding, that there are situations in which the state's duty is so clear that the failure to act might violate the due process clause.[16]

14. Similarly, the Supreme Court recently held it proper to enjoin the enforcement of a state regulation which in its application required a private club to adhere to its announced policy of discrimination. Moose Lodge v. Irvis, 407 U.S. 163, 176–179, 92 S.Ct. 1965, 1973–1974, 32 L.Ed.2d 627 (1972). As to this part of the case, there was no question that there was "state action" and that the particular action, which in its application required racial discrimination, deprived plaintiff of his Fourteenth Amendment rights.

15. It is undisputed that at common law a utility could cut off service for nonpayment of bills.

16. Such an affirmative duty to act should, if proper respect is afforded to our democratic system of government, arise only in rare situations. Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068, suggests that circumstances in cases involving fundamental rights may give rise to such a duty. That case involved governmental refusal—in essence, therefore, a form of inaction—to protect claimed First Amendment rights. In

Moose Lodge v. Irvis, 407 U.S. 163, 175, 92 S.Ct. 1965, 32 L.Ed.2d 627 n. 3, however, the Court construed its earlier opinion in *Pollak* as based on the affirmative approval by the regulatory agency of the challenged practice. It is thus not clear what the Court's attitude would have been in the *Pollak* situation had the Public Utility Commission taken no action at all instead of investigating and approving the challenged activity. In some circumstances a state may also be under a duty to act affirmatively to prevent racial discrimination. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct 856, 6 L.Ed.2d 45, can be viewed either as a case involving a failure of the state to act to prevent discrimination under circumstances which imposed a duty to act, or as a case involving state participation in the discriminatory act itself, and hence state action rather than inaction. The Supreme Court's own analysis of the facts in *Burton* suggests the "action" alternative. The Wilmington Parking Authority, an agency of the State of Delaware, did not merely condone discriminatory conduct by its lessee-restauranteur.

Even so, analysis of the "inaction" claim reveals that the alleged shortcomings in Wisconsin's administrative procedures involve policy decisions which a state may make without offending the Federal Constitution.

Plaintiff contends that no disconnection for nonpayment, at least if the arrearage is disputed, should be permitted unless the credit dispute has first been resolved by an impartial decision maker. Less forcefully he also contends that the regulation failed to require adequate notice of the proposed termination.[17] We shall comment on both points.

■■■ Defendants argue that requiring a pretermination hearing would be costly, would provide an incentive to dispute arrearages, and by delaying the discontinuance of service would, in effect, compel the Company to extend credit to nonpaying customers.[18] If these arguments are valid, presumably the cost of service might be increased. Such policy considerations must give way, however, if the Constitution commands greater procedural safeguards before a termination may be effected.[19] We therefore consider whether "due process" requires a hearing before an impartial arbiter before service may be disconnected.

■■■ The answer is provided by a consideration of the remedies which are actually available to plaintiff. If those remedies satisfy the standards of due process articulated in recent Supreme Court decisions, the state has no constitutional duty to require or provide other procedures merely because they might be better as a matter of policy.[20]

The two "remedies" which customers have most frequently invoked are informal. The record indicates that most credit disputes are resolved by an official of the Company or through the good offices of the commission. The informal disposition of disputes in either of these ways is not really a legal remedy for an aggrieved customer, but the fact that most customer controversies are easily resolved tends to minimize the need for a special formal procedure to handle a case such as plaintiff's.

The formal remedies available to plaintiff include two primary alternatives. First, he has a right to seek emergency relief in the state courts. If the termination of service would cause a customer irreparable harm, and if he had paid the disputed bill by check, or had saved his receipt, or had other convincing evidence of payment at hand, presumably a Wisconsin court would temporarily enjoin the disconnect pending a full hearing on the merits;[21] more weighty controversies are frequently resolved by a chancellor on equally short notice.[22] Second, the cus-

Rather, it was a joint participant in, and direct beneficiary of, the challenged discrimination. See especially 365 U.S. at 723–725, 81 S.Ct. 856. Although the word "coconspirator" ill suits a public authority, familiar principles of partnership and agency law made it proper to ascribe responsibility for the refusal to serve a black patron to the state itself. The state therefore deprived one of its citizens of the equal protection of its laws.

17. He has admitted receiving notice which gave him time to obtain counsel and to file a complaint in the federal district court before the date of proposed termination.

18. Compare Midstate Horticultural Co., Inc. v. Pennsylvania Railroad Co., 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96.

19. See, e. g., Fuentes v. Shevin, 407 U.S. 67, 90, 92 S.Ct. 1983, 1999, 32 L.Ed.2d 556, n. 22 (1972) ; Stanley v. Illinois, 405 U.S. 645, 656–658, 92 S.Ct. 1208, 31 L. Ed.2d 551 (1972).

20. Moreover, if the available procedures satisfy due process standards, the act of the commissioners in approving the Power Company's disconnect procedure does not deprive plaintiff of due process of law. Thus, the "act" of approval and the "inaction" in failing to follow the procedures requested by plaintiff may be considered together.

21. In fact, if plaintiff's proof of payment were not rebutted, he might even be entitled to summary judgment.

22. Perhaps the most notable recent example is the "Pentagon Papers" case.

tomer may forestall the disconnect by paying the disputed amount under protest and then suing for a refund; such a procedure is frequently required in disputes over taxes, rent, or other arrearages, without being considered constitutionally defective.[23]  A third formal remedy is also available.  If the Power Company wrongfully cuts off plaintiff's electricity, he may sue in tort for his actual damages.[24]  Thus, Wisconsin does provide the customer of the utility with

United States v. New York Times Co., 328 F.Supp. 324 (S.D.N.Y.1971), reversed and remanded, 444 F.2d 544 (2d Cir., en banc, 1971), reversed, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822.

23. In Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407, the Supreme Court refused to intervene in a state tax dispute because the taxpayer could pay the tax and sue for a refund in the state courts, such procedure being considered a "plain, adequate, and complete" remedy.  If such a procedure deprived a taxpayer of due process of law, it would certainly not be plain, adequate, and complete. See *id.,* at 297–298, 300–301, 63 S.Ct. 1070.

In Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36, a tenant sought to defend a possessory action brought by his landlord for nonpayment of rent on the ground that the premises were uninhabitable and therefore there was no obligation to pay the rent.  State law did not permit such a defense in a possessory action.  In order to litigate that particular dispute, the tenant had to bring his own action against the landlord.  If the tenant had not in fact paid the disputed rent, the landlord would prevail in the possessory action.  Thus, in order to retain possession while litigating the dispute, the tenant not only had to pay the accruing rent (a requirement upheld in *Lindsey,* 405 U.S. at 65, 92 S.Ct. 862), but also had to pay the back rent, an obligation which he disputed.  If he did not pay the back rent, he would lose in the possessory action and therefore would lose possession while he was prosecuting his own suit against the landlord.  Thus, the Supreme Court sustained a procedure which required the payment of a disputed charge in order to maintain the status quo while litigating the dispute.

24. At least such remedy is recognized in other common law jurisdictions and presumably is available in Wisconsin. See, *e.g.,* Steele v. Clinton Electric Light & Power Co., 123 Conn. 180, 193 A. 613, 112 A.L.R. 232 and annotation, 112 A.L.R. 237–243, and see generally annotation, 108 A.L.R. 1174, 1192–1197. See also Oklahoma Natural Gas Co. v. Young, 116 F.2d 720 (10th Cir. 1940). The Wisconsin Supreme Court has held

that a gas light company can be required to pay damages for pecuniary loss and for inconvenience and annoyance when initial service is refused because the customer refuses to agree to abide by illegal company rules.  Shepard v. Milwaukee Gas Light Co., 15 Wis. 318 (1862) (1873 reprint, at p. 349).  We can see no reason why the law would be any different where there is an unlawful termination of service.  The general rule is that while utilities may terminate service for nonpayment of charges, they act at their peril when there is a bona fide dispute as to liability or amount due.  If the utility cuts off service and the customer ultimately prevails on the dispute, the utility is liable in damages for wrongful termination of service.  See annotation, 112 A.L.R. 237, part II at 241 and later case service; Sims v. Alabama Water Co., 205 Ala. 378, 87 So. 688, 689–690 (1921); Mobile Electric Co. v. Nelson, 209 Ala. 554, 96 So. 713, 718 (1923).  The theory of the "at its peril" rule was stated in Kentucky Utilities Co. v. Warren Ellison Cafe, 231 Ky. 558, 21 S.W.2d 976, 978 (1929):

"If a public service company discontinues its service to a consumer, it passes judgment on its own case.  Therefore it must know that its rules have been violated after a correct bill has been submitted before it is justified in applying the cut-off rule.  If it applies the rule without the right so to do and the customer is damaged thereby, the company is liable for damages naturally flowing from its act in discontinuing the service."

See also Steele v. Clinton Electric Light & Power Co., *supra,* 193 A. at 615, 112 A.L.R. at 236.

In this case, if payment was in fact made, the Company's termination would be wrongful and it would incur liability for damages.  We note the existence of a treble damage provision in Wis.Stat.Ann. § 196.64, which the Wisconsin courts may or may not consider applicable.

The Power Company in this case has a rule on file (407.1(g)) with the commission providing that it shall not be responsible for any damage, loss or injury caused by suspension of service for nonpayment of service bills.  We assume, of course, that this rule would not apply

impartial tribunals empowered to resolve disputes over billings and to grant appropriate relief.

As a practical matter, we recognize that most disputes are so nominal in amount that judicial remedies are seldom, if ever, invoked. In most cases the only "hearing" actually held is that provided by the Power Company itself. Plaintiff therefore contends that fair procedure requires the reference of disputes over billing to an inpartial arbiter before he is required either to suffer the inconvenience of a termination or to pay a disputed amount under protest. In practice, he argues, it simply is not fair to permit the Power Company to be the effective final judge of its own credit disputes. There are at least three answers to the argument.

■ First, the fact that a dispute may be so trivial that an injured party may elect to suffer injustice rather than to assert his legal rights—in other words, that the maxim *de minimus non curat lex* suitably applies—is certainly no reason for construing the Federal Constitution as requiring special procedural safeguards for such matters. The constitutional commands are met once an *opportunity* for a hearing is afforded. That opportunity is protected by the state enforced requirement of a five-day notice, together with the availability of effective judicial remedies.[25]

Second, in those cases in which the judgment of the Power Company is erroneous, that judgment has no finality. If service should be terminated wrongfully, the Company must answer in damages; the potential injury that a customer may suffer from a loss of electricity is the measure of the Company's risk of error. Thus, although in a sense the Company is the judge of its own case, it acts at its peril whenever it exercises that judgment.

■ Third, since the conclusion of the "hearing" conducted by the Power Company itself is only a preliminary and tentative determination of the ultimate rights of the parties, the fairness of that hearing must be appraised in the context of the entire procedure made available by the state. If the state is ultimately required to adjudicate a customer's liability for an arrearage, it must, of course, provide a full judicial hearing, which, as we have noted, it does in this case. But a lesser standard applies to determinations which are only tentative in character even though they have an immediate and significant impact on the litigant. Bianchi v. Morales, 262 U.S. 170, 43 S.Ct. 526, 67 L.Ed. 928.[26] In this type of hearing "procedural due process will be satisfied by an inquiry limited to the determination whether there is a reasonable possibility of judgments in the amounts claimed being rendered against the licensee." Bell v. Burson, 402 U.S. 535, 540, 91 S. Ct. 1586, 1590, 29 L.Ed.2d 90.

Whether we examine the specific dispute between plaintiff and the Power

---

where the termination itself was not justified.

25. "[W]e deal here only with the right to an *opportunity* to be heard." Fuentes v. Shevin, 407 U.S. 67, 92, 92 S.Ct. 1983, 2000, 32 L.Ed.2d 556 n. 29 (1972). Contrary to the situation in *Fuentes*, plaintiff here did receive advance notice and an opportunity to be heard. The Court continued:

"Since the issues and facts decisive of rights in repossession suits may very often be quite simple, there is a likelihood that many defendants would forego their opportunity, sensing the futility of the exercise in the particular case." *Id.*

In the present case, there is certainly no constitutional objection to a procedure which, while providing a remedy in meritorious cases, will discourage frivolous claims.

26. Mr. Justice Holmes, in a brief opinion for a unanimous Court in *Bianchi*, held that possessory actions to foreclose a mortgage in which the only permissible defense was payment did not deprive the mortgagor of due process of law since the action, while determining immediate possessory rights, did not determine ultimate rights. Other defenses could be asserted in other proceedings to determine the ultimate rights of the parties.

Company, or its experience with the class he purports to represent, certainly "there is a reasonable possibility of judgment in the amounts" reflected by the Company records if they are contradicted only by a customer's oral statement and if they have been reexamined for the purpose of correcting possible error. In a sense, as plaintiff argues, the Company's agent may not be "impartial"; but certainly its accounting procedures must deal impartially with all customers and must have integrity to comply with the commission's regulatory requirements. The Company's incentive to sell electricity to paying customers is at least as great as the desire to collect past due accounts. The partiality that may arise in subsequent litigation, or that may characterize a particular discussion between a Company clerk and a dissatisfied customer, does not undermine the conclusion that the Company records, if verified after a specific objection is made, will establish a reasonable possibility of judgment in favor of the utility.

The "reasonable possibility" test of Bell v. Burson has been restated in slightly different language in other recent cases; those cases neither hold nor imply that there is a rigid requirement that a determination of "reasonable possibility" must always be made by an impartial tribunal. The supporting procedure must be "meaningful," Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62, and "appropriate to the nature of the case," Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865. It need not take any particular form and is governed by the aim of establishing the "probable validity" of the underlying claim.[27] The purpose of such a tentative determination "is to prevent unfair and mistaken deprivations of property" when the moving party "has little probability of succeeding on the merits of the dispute."[28]

Even without the participation of an independent hearing examiner, or some other impartial arbiter, the tentative determination made by the Power Company satisfies the due process standard as thus defined.[29]

The necessity for the participation of an impartial arbiter at a particular stage of a constitutionally protected procedure depends, in part, on the character of the interest at stake and the potential for error which may result from his absence. In cases involving interests of greater import than the temporary

27. Sniadach v. Family Finance Corp., 395 U.S. 337 at 343, 89 S.Ct. 1820, 23 L.Ed. 2d 349 (Mr. Justice Harlan concurring).

28. "The nature and form of such prior hearings, moreover, are legitimately open to many potential variations and are a subject, at this point, for legislation—not adjudication.[33] Since the essential reason for the requirement of a prior hearing is to prevent unfair and mistaken deprivations of property, however, it is axiomatic that the hearing must provide a real test. "[D]ue process is afforded only by the kinds of "notice" and "hearing" which are aimed at establishing the validity, or at least the probable validity, of the underlying claim against the alleged debtor *before* he can be deprived of his property * * *.' Sniadach v. Family Finance Corp., 395 U.S. at 343, 89 S.Ct. at 1823 (Harlan, J., concurring). See Bell v. Burson, *supra*, 402 U.S. at 540, 91 S.Ct. at 1589; Goldberg v. Kelly, *supra* 397 U.S. at 267, 90 S.Ct. at 1020." Fuentes v. Shevin, 407 U.S. 67, 97, 92 S.Ct. 1983, 2002, 32 L.Ed.2d 556 (1972). The Court's note 33 is as follows:

"33. Leeway remains to develop a form of hearing that will minimize unnecessary cost and delay while preserving the fairness and effectiveness of the hearing in preventing seizures of goods where the party seeking the writ has little probability of succeeding on the merits of the dispute." *Id.*

29. In view of our holding we need not reach the question whether the due process clause would preclude the state from either requiring the losing litigant to pay the cost of arbitration before an impartial tribunal, or at least assessing court costs which though minimal in normal litigation might be so disproportionately large in relation to the amount involved in these disputes as to deter resort to impartial arbitration.

use of money, or even the possible loss of electric service, we have squarely rejected the contention that an impartial hearing examiner is an essential component of due process. Shirck v. Thomas, 447 F.2d 1025, 1027–1028 (7th Cir. 1971).[30] In the present case the existing procedures provide meaningful protection against the risk that the Power Company will cut off service when it "has little probability of succeeding on the merits" of a dispute with a customer.

■ Commission supervision of the conduct of the Power Company, together with its own self-interest in maintaining customer good-will and avoiding exposure to potential damage liability, provides a significant guarantee of impartiality in collecting arrearages. The Company's experience with about 10,000 terminations a year, which has resulted in only a few disputes and almost no litigation, indicates that the routine participation of an independent arbiter is not essential to establish the "probable validity" of a claim. The possibility of an occasional error at a preliminary stage of a procedure which is routinely fair does not invalidate the entire procedure.

■ When we consider both the formal judicial procedures which are provided by the State of Wisconsin, and the informal procedures which are available at the Company or through the good offices of the commission, we have no doubt that the customer's opportunities to forestall, or to remedy, a wrongful termination of service satisfy the standard of procedural due process as defined in Bell v. Burson. See also F.C.C. v. WJR, 337 U.S. 265, 275–277, 69 S.Ct. 1097, 93 L.Ed. 1353; Cafeteria and Restaurant Workers v. McElroy, 367 U.S. 886, 894–895, 81 S.Ct. 1743, 6 L.Ed.2d 1230.

■ This conclusion is premised, of course, on the existence of adequate notice. In Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), the Supreme Court invalidated state replevin procedures which authorized the seizure of property without any advance notice whatsoever. Without any notice, the debtor would have no opportunity to pay a disputed amount under protest, to have a clerical mistake corrected, or to initiate any protective or remedial action before being deprived of possession of goods or chattels. The rationale of

---

30. The purpose of the hearing mandated by Roth v. Board of Regents, 446 F.2d 806 (7th Cir. 1971), followed in Shirck v. Thomas, was to protect the career interests of non-tenured teachers from action taken on a basis "wholly without reason." The standard is not unlike the "reasonable possibility" test of Bell v. Burson. It is also relevant that the Supreme Court's application of the "due process" guarantees in Groppi v. Leslie, 404 U.S. 496, 92 S.Ct. 582, 30 L.Ed.2d 632, assumes that there are situations in which there is no need for an impartial *decision maker* if the *right to notice* and an opportunity to be heard is adequately respected.

The Supreme Court reversed Roth, Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 . . . (1972), and vacated our judgment in Shirck, Thomas v. Shirck, 408 U.S. 940, 92 S.Ct. 2848, 33 L.Ed.2d 764 (1972), on the ground that a nontenured teacher's expectancy of future employment is not "liberty" or "property" within the Fourteenth Amendment; in those cases, the Court did not decide whether a pretermination hearing before the School Board— hardly an impartial decision maker— satisfied due process. However, in a companion case decided the same day, Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 the Court held that:

"Proof of * * * a property interest would not, of course, entitle him to reinstatement. But such proof would obligate *college officials* to grant a hearing at his request, where he could be informed of the grounds for his non-retention and challenge their sufficiency." *Id.* at 603, 92 S.Ct. at 2700. (Emphasis added.)

Quite clearly the Court agrees with our disposition of the impartial decision maker contention in *Shirck*. Indeed, even the hearing which the dissenters in *Roth* would mandate would not include an impartial arbiter.

*Fuentes* is inapplicable to this case.[31] Plaintiff's discussions with the Power Company took place over a six-month period. Even if no more than the five days prescribed by rule were involved, he had adequate time in which to forestall termination by seeking informal review, by paying the arrearage under protest, or even by filing suit in a state court. (He did, after all, have time to file this federal suit.) There can be no serious quarrel with the timing of the Company's notice.

It has been suggested, however, that the required content of the notice is inadequate. It advises the customer that service will be terminated unless the bill is paid within five days, but does not tell him how he may have a dispute over an arrearage resolved. We are satisfied that such an omission is not a fatal defect in the notice. Obviously the customer would know that Company personnel are available to correct billing errors. He might not realize that informal assistance is available at the commission; but since the commission procedure does not in fact provide a legal remedy to an aggrieved customer, it would be inappropriate and might even be misleading to imply that a specific remedy is available in that forum.[32] As far as possible judicial remedies are concerned, the customer is presumed to know the law, or at least to know that he should consult a lawyer rather than rely on a potential adversary for a description of his legal rights. Whether it would be unwise to encourage credit disputes by adding detail to the notice, or wise to give customers more information in a stereotyped form that might or might not be appropriate in specific cases, involved questions of regulatory policy, not an issue of constitutional dimensions.

■ Whether we analyze the constitutional issue in terms of the action which the State of Wisconsin has taken, or in terms of its failure to act more effectively, we find no merit in plaintiff's claim against the defendant commissioners.

### B.

■ Plaintiff argues that the defendant Power Company, acting "under color of" state law, threatened to deprive him of a federal right. The federal right asserted is not, of course, any entitlement to continued service;[33] it is simply the procedural right to a fair opportunity to be heard. Our analysis of plaintiff's claim against the commissioners discloses no deprivation of that right. We are also convinced that the Power Company's challenged action is not "under color of" state law within the meaning of § 1983.

As we view the record, the action of Wisconsin Electric is that of a private company. The state is neither a "joint participant" nor a "direct beneficiary" of that action in the sense in which those words were used in Burton v. Wilmington Parking Authority, 365 U.S.

31. The existence of notice and opportunity to invoke state judicial processes before termination amply distinguish this case from the precedents on which the Court relied in *Fuentes*, where plaintiff also had received *no advance notice* and therefore no opportunity to be heard before his rights were affected. *See, e. g.,* Armstrong v. Manzo, 380 U.S. 545, 550, 85 S.Ct. 1187, 14 L.Ed.2d 62; Sniadach v. Family Finance Corp., 395 U.S. 337, 342, 89 S.Ct. 1820, 23 L.Ed.2d 349.

32. As a matter of policy it might be desirable for the Commission to insist on a description of the function it is prepared to perform, but the Federal Constitution certainly does not require a notice to describe the possibility of commission "pressure" or informal assistance as a specific remedy. Such a remedy is really comparable to a complaint to the Better Business Bureau or local newspaper; it may well be effective in a particular case, but need not be described to satisfy any constitutionally mandated procedural requirement.

33. Plaintiff's right to be served by a public utility is bottomed on common law, on Wisconsin statutes and on the regulations of the Wisconsin Public Service Commission.

715, 81 S.Ct. 856, 6 L.Ed.2d 45.[34] It is true that the general revenues of the utility, like those of every other tax-paying business in Wisconsin, contribute to the state's support; it is also true that this business, like many others, must comply with a variety of regulatory controls.[35] Unless § 1983 is to become all-encompassing, such factors are obviously insufficient to bring private conduct within the coverage of this federal statute.[36]

■ The "under color of" provision encompasses only such private conduct as is supported by state action.[37] That

34. See the discussion of *Burton* in note 15, *supra*. Nor is P.U.C. v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068, comparable. That case involved the failure or refusal of the Public Utilities Commission of the District of Columbia to prohibit the Capital Transit Co. from playing transcribed music for its passengers. The Court explained the government's participation as follows:

"We find in the reasoning of the court below a sufficiently close relation between the Federal Government and the radio service to make it necessary for us to consider those Amendments. In finding this relation we do not rely on the mere fact that Capital Transit operates a public utility on the streets of the District of Columbia under authority of Congress. Nor do we rely upon the fact that, by reason of such federal authorization, Capital Transit now enjoys a substantial monopoly of street railway and bus transportation in the District of Columbia. We do, however, recognize that Capital Transit operates its service under the regulatory supervision of the Public Utilities Commission of the District of Columbia which is an agency authorized by Congress. We rely particularly upon the fact that that agency, pursuant to protests against the radio program, ordered an investigation of it and, after formal public hearings, ordered its investigation dismissed on the ground that the public safety, comfort and convenience were not impaired thereby. * * *

"We, therefore, find it appropriate to examine into what restriction, if any, the First and Fifth Amendments place upon the Federal Government under the facts of this case, *assuming that the action of Capital Transit in operating the radio service, together with the action of the Commission in permitting such operation, amounts to sufficient Federal Government action to make the First and Fifth Amendments applicable thereto.*" 343 U.S. at 462–463, 72 S.Ct. at 820–821. (Emphasis added.)

Thus, the Court *assumed* for purposes of decision that there was sufficient government involvement in the matter to raise issues under the First and Fifth Amendments. Whether the assumption is predicated on the action of the government, see the reference to *Pollak* in Moose Lodge v. Irvis discussed in note 16, *supra*, or upon its inaction in failing to prohibit the challenged conduct, or indeed whether special concern was justified because a First Amendment claim was asserted, we have similarly assumed, without deciding in this case that the defendant commissioners' involvement was sufficient to make it appropriate for us to review the claimed constitutional deprivation. That assumption, however, does not support the view that the Power Company has acted "under color of" state law, no parallel question having been presented in *Pollak*.

35. Compliance with state economic regulations may provide a private company with a defense to a Sherman Act prosecution, see, *e. g.*, Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, but the inapplicability of that federal statute to certain conduct does not imply that an entirely different federal statute does apply. We do not view the Civil Rights Act of 1871 as either a species of or a substitute for, anti-monopoly legislation.

36. "The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. * * * [S]uch a holding would utterly emasculate the distinction between private as distinguished from State conduct * * *." Moose Lodge v. Irvis, 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972).

37. "Quite apart from this Court's construction of the identical 'under color of' provision of § 2 of the 1866 Act, the legislative history of § 1 of the 1871 Act, the lineal ancestor of § 1983, also indicates that the provision in question here was intended to encompass only conduct supported by state action." Adickes v. S. H. Kress

support may take various forms, but it is quite clear that a private person does not act under color of state law unless he derives some "aid, comfort, or incentive," either real or apparent, from the state.[38] Absent such affirmative support, the statute is inapplicable to private conduct.[39]

& Co., 398 U.S. 144, 163, 90 S.Ct. 1598, 1611, 26 L.Ed.2d 142.

In Moose Lodge v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), it was argued that the state's granting of a liquor license and the regulation exercised over the grantee were sufficient to make a private club's action in discriminating on the basis of race action taken "under color of" state law. The Court disagreed, noting that the regulation did not *foster* or *encourage* the racial discrimination:

"The District Court was at pains to point out in its opinion what it considered to be the 'pervasive' nature of the regulation of private clubs by the Pennsylvania Liquor Control Board. As that court noted, an applicant for a club license must make such physical alterations in its premises as the board may require, must file a list of the names and addresses of its members and employees, and must keep extensive financial records. The board is granted the right to inspect the licensed premises at any time when patrons, guests or members are present.

"However detailed this type of regulation may be in some particulars, it cannot be said to in any way *foster* or *encourage* racial discrimination. Nor can it be said to make the State in any realistic sense a partner or even a joint venturer in the club's enterprise." *Id.* at 176–177, 92 S.Ct. at 1973. (Emphasis added.)

38. "To understand how that language applies to private persons, it is helpful to consider its application to state officials. In other legal usage, the word 'color,' as in 'color of authority,' 'color of law,' 'color of office,' 'color of title,' and 'colorable,' suggests a kind of holding out and means 'appearance, semblance, or *simulacrum*,' but not necessarily the reality. See H. Black, Law Dictionary 331–332 (rev. 4th ed. 1968). However, as the word appears in § 1983, it covers both actions actually authorized by a State, see Myers v. Anderson, 238 U.S. 368, 35 S.Ct. 932, 59 L.Ed. 1349 (1915); Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L. Ed. 759 (1927); Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939), and misuse of state authority in ways not intended by the State, see,

e. g., Monroe v. Pape, [365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492]; Screws v. United States, [325 U.S. 91,] at 111, 65 S.Ct. 1031, at 1040, 89 L.Ed. 1495. In some of these latter situations there is a holding out in that the official uses his actual authority to give the appearance that he has authority to take the particular action he is taking. In other cases the abuse of power is so palpable that the victim or any observer may well be aware that the official is exceeding his authority, so that any holding out of authority would be wholly transparent. In these cases the misuse of authority alone is enough to warrant recovery. See, e. g., Monroe v. Pape, supra; United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941); Catlette v. United States, 132 F.2d 902 (C.A. 4th Cir. 1943). Thus, a public official acting by virtue of his official capacity always acts under color of a state statute or other law, whether or not he overtly relies on that authority to support his action, and whether or not that action violates state law. A private person acts 'under color of' a state statute or other law when he, like the official, in some way acts consciously pursuant to some law that gives him *aid, comfort, or incentive*, cf. Griffin v. Maryland, 378 U.S. 130, 84 S.Ct. 1770, 12 L.Ed. 2d 754 (1964); Flemming v. South Carolina Elec. & Gas Co., 224 F.2d 752 (C.A. 4th Cir. 1955), appeal dismissed, 351 U.S. 901, 76 S.Ct. 692, 100 L.Ed. 1439 (1956); or when he acts in conjunction with a state official, as in United States v. Price, [383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267] * * *." Adickes v. S. H. Kress & Co., 398 U.S. 144, at 211–212, 90 S.Ct. 1598, at 1630–1631 (separate opinion of Mr. Justice Brennan). (Emphasis added.)

39. It should be noted that all parties in Moose Lodge v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), agreed that a private club could discriminate if it chose to do so. *Id.* at 173, 92 S.Ct. 1965. The question was whether its holding a state liquor license made this discrimination an act taken "under color of" state law. See note 37, *supra*.

We believe that affirmative support must be significant,[40] measured either by its contribution to the effectiveness of defendant's conduct, or perhaps by its defiance of conflicting national policy,[41] to bring the statute into play. There is no such significant affirmative state support of Wisconsin Electric's proposed termination of plaintiff's service.

It is true that the Company's powers are enhanced in at least two respects by the state. First, the state has authorized an electric company to enter private property under certain circumstances.[42] If that authority were invoked by the defendants in this case, an entirely different issue would be presented. On the record before us, however, it appears that the termination of plaintiff's service can be completed simply by throwing the proper switch or disconnecting the proper wires.[43]

Second, the state has in effect granted monopoly protection to Wisconsin Electric. No competitor may invade the Company's area of service without the permission of the commission. Customers, like plaintiff, are therefore denied the practical and often effective remedy of taking their patronage elsewhere when treated unfairly by a supplier. It

40. Immediately after the passage in *Moose Lodge* quoted in note 33, *supra*, the Court said:
   "Our holdings indicate that where the impetus for the discrimination is private, the State must have 'significantly involved itself with invidious discriminations,' Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 1634, 18 L.Ed. 2d 830 (1970), in order for the discriminatory action to fall within the ambit of the constitutional prohibition." At 173, 92 S.Ct. at 1971. (Emphasis added.)

41. For example, the "fundamental value" of erasing racial discrimination in all its forms seems to underlie Mr. Justice Brennan's dissenting opinion in *Moose Lodge*, at 184, 92 S.Ct. at 1977 where he quotes as follows from his separate opinion in Adickes v. S. H. Kress & Co., 398 U.S. 144, 190–191, 90 S.Ct. 1598, 1620, 26 L.Ed.2d 142:
   "The state-action doctrine reflects the profound judgment that denials of equal treatment, and particularly denials on account of race or color, are singularly grave when government has or shares responsibility for them. Government is the social organ to which all in our society look for the promotion of liberty, justice, fair and equal treatment, and the setting of worthy norms and goals for social conduct. Therefore something is uniquely amiss in a society where the government, the authoritative oracle of community values, involves itself in racial discrimination. Accordingly, * * * the cases that have come before us [in which] this Court has condemned significant state involvement in racial discrimination, however subtle and indirect it may have been and

whatever form it may have taken[,] * * * represent vigilant fidelity to the constitutional principle that no State shall in any significant way lend its authority to the sordid business of racial discrimination."
   As that passage indicates, Mr. Justice Brennan would agree that the state involvement must be "significant." It may well be that he would find that a lesser degree of state involvement would satisfy the significance test when racial discrimination is involved. But the support for his analysis, which is provided by the historical setting in which the Ku Klux Klan Act of 1871 was enacted, is, of course, completely inapplicable to the issue presented here.

42. Wis.Stat.Ann. § 196.171 provides for entering buildings at reasonable times on written authority from the appropriate utility officer for the purpose of "inspecting, examining, repairing, installing or removing the meters, pipes, fittings, wires and works for supplying or regulating the supply of gas, electricity or water and of ascertaining the quantity of gas, electricity or water supplied."

43. While it is presumably possible that the Power Company might disconnect service under the authority of the statute cited in note 42, *supra*, such as by removing the meter, there is no indication in this case that it would have to do so, and hence no indication that the state statute lends any significant support to the termination of service. That the Company might, under the statute, later remove its meter has no bearing on the question before us as long as the Company need not exercise rights under the statute in order to effect the termination itslf.

follows that the utility's threat to discontinue service unless the arrearage is promptly paid is more effective by reason of the state's protection of its monopoly.

That kind of support may well be present in all transactions between regulated companies and their customers.[44] As stated, however, we believe the significance of that support must be evaluated to determine whether it brings § 1983 into play;[45] otherwise the federal statute would soon supersede vast areas of state administrative regulation.[46] For that reason the significance of the defendants' monopoly position must be considered in the context of the particular controversy in which federal jurisdiction under § 1983 is invoked.[47]

■ We are satisfied that defendant's monopoly will have no significant impact on the resolution of plaintiff's $9.89 dispute, or other comparable disputes.[48] Even if there were no commission control of entry, the assumption that there would be alternative sources of electrical service available in any given residential area is somewhat unrealistic. Assuming, however, that an alternative source of service might be available, it is most unlikely that one who could not forestall a disconnect by paying the disputed amount under protest could have a new connection installed and credit extended within a five-day period.[49] As a practical matter, the absence of competition does not deprive the customer of an effective remedy.

On the other hand, the commission does provide customers with informal as well as formal remedies. As a practical matter, it is the commission's pervasive regulatory powers that lend real significance to even the most informal complaint by a customer. As a legal matter, the detailed regulation of the utility, including the specific requirement that the Company adhere to its five-day notice rule as filed pursuant to § 113.13(4), inevitably inhibits the Company's ability to treat its customers arbitrarily. If the commission is performing its as-

44. At least if the regulation is sufficiently inclusive to require a showing of public convenience and necessity as a condition of entry.

45. "In contrast, Indiana was not so significantly involved in the affairs of Central Catholic High School that these expulsions could justifiably be deemed state action." Bright v. Isenbarger, 445 F.2d 412, 414 (7th Cir. 1971).

46. Compare the Court's express disclaimer of reliance on the monopoly factor in P.U.C. v. Pollak, 343 U.S. 451, 462, 72 S.Ct. 813, 96 L.Ed. 1068, quoted in note 34, *supra*.

47. "It overlooks the essential point—that the state must be involved not simply with some activity of the institution alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury." Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968).
See also Bright v. Isenbarger, 445 F.2d 412, 413 (7th Cir. 1971):
"In this case the state played no role in defendant's expulsion of plaintiffs."
The Supreme Court in Moose Lodge v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L. Ed.2d 627 (1972), directed its attention to the state involvement with the particular act—discrimination against non-white guests—in controversy and was not persuaded by the fact that the state might have been involved in other areas of the club's activities. See quotation in note 37, *supra*.

48. Although there are almost 10,000 disconnects for nonpayment each year, only rarely have disputes arisen, and in those cases the record indicates that the five-day notice has provided an opportunity to resolve almost all—perhaps all but plaintiff's—past disputes.

49. Most utilities charge an initial connection fee and may also require a deposit of one or more month's anticipated charges. As long as such requirements are uniformly enforced, there can be no question that they do not deprive a potential customer of due process of law. But if a customer has to pay such fees to get service with a new company he might as well pay his bill with the old company and sue for a refund. Furthermore, given the nature of electric services, the equipment required to provide them, and so forth, it may well be that even without a state countenanced monopoly, plaintiff would find no alternative source of supply.

signed mission faithfully, as we must of course assume, the extent to which a utility's economic power is enhanced by commission control of entry is offset by other controls embodied in a coordinated regulatory scheme. In short, the commission's control of entry is merely one of the factors affecting its regulation of the utility for the purpose of safeguarding the overall public interest. At least with respect to the issues presented in this litigation, the monopoly factor does not provide the necessary ingredient of added state support of private conduct —the termination of electric service— which will transform an issue of state regulatory policy into a federal civil rights case under § 1983.[50]

We reaffirm our decision in Kadlec v. Illinois Bell Telephone Co., 407 F.2d 624 (7th Cir. 1969), and our more recent decision in Particular Cleaners, Inc. v. Commonwealth Edison Co., 457 F.2d 189 (7th Cir. 1972). We conclude that Wisconsin Electric's private action in terminating service to a delinquent account after five days notice derives, at best, insignificant support from the State of Wisconsin and is therefore not "under color of" state law or custom within the intendment of § 1983.

The decision of the district court is affirmed.

FAIRCHILD, C. J., concurs in the result.

SPRECHER, Circuit Judge, dissenting, with whom SWYGERT, Chief Judge, joins.

I respectfully dissent. I definitely find the existence of state action and activity under color of state law, and I firmly believe that procedural due process was not accorded to the plaintiff.

I.

The interpretation of constitutional amendments [1] and Congressional enactments [2] is necessarily influenced by the common law in effect at the time of their adoption or ratification. Congress passed the Fourteenth Amendment in 1866 and ratification was completed in 1868. The Ku Klux Act (42 U.S.C. § 1983) was enacted on April 20, 1871. What people understood about "state action" or "under color of any statute, ordinance, regulation, custom, or usage, of any State" as applied to public utilities in 1866–1871 was as much a part of the "original understanding" [3] of the Four-

---

50. Mr. Justice Douglas in his dissent in Moose Lodge v. Irvis, 407 U.S. 163, 182, 92 S.Ct. 1965, 32 L.Ed.2d 627, viewed the "monopoly" aspect of that case as critical. He concluded that the liquor license "monopoly" in practice denies a black person that which he could otherwise obtain. As we have indicated, we do not believe the monopoly position of Wisconsin Electric denied Mr. Lucas anything that, but for the monopoly, he would have been able to obtain, nor has it given the Power Company any significant advantage with respect to terminations which the Company would not have had without its monopoly. Furthermore, since electric rates are regulated, the Company does not have the "monopoly price" advantage that Mr. Justice Douglas saw as a defect in the Pennsylvania liquor license system.

1. Ex Parte Grossman, 267 U.S. 87, 108–109, 45 S.Ct. 332, 333, 69 L.Ed. 527 (1925): "The language of the Constitution cannot be interpreted safely except

by reference to the common law and to British institutions as they were when the instrument was framed and adopted." The Fourteenth Amendment should be construed in the light of conditions existing when it was adopted and ratified. See In re Humason, 46 F. 388 (E.D. Wash.1891).

2. Moragne v. States Marine Lines, Inc., 398 U.S. 375, 392, 90 S.Ct. 1772, 1783, 26 L.Ed.2d 339 (1970): "It has always been the duty of the common-law court to perceive the impact of major legislative innovations and to interweave the new legislative policies with the inherited body of common-law principles—many of them deriving from earlier legislative exertions."

3. See Frank and Munro, "The Original Understanding of 'Equal Protection of the Laws,'" 50 Col.L.Rev. 131 (1950); Bickel, "The Original Understanding and the Segregation Decision," 69 Harv.L. Rev. 1 (1955).

teenth Amendment and the Ku Klux Act as "any action of a State * * * directed by way of discrimination against the negroes as a class." [4]

The original common law distinction between a public and a private business depended upon whether the enterprise was monopolistic or competitive.[5] Whatever in medieval England was in short supply, such as doctors, became publicly regulated; an example is the regulation of doctor's fees as early as 1359. The trade guilds fostered occupational monopolies. As population and resources increased, these artificial monopolies tended to disappear, leaving the natural monopolies, which by their nature would not admit of free competition, such as water, gas, telephone and electric companies. When these natural monopolies were given a franchise by the state to supply exclusive services, often along with the power of eminent domain and public easements, they assumed the correlative obligation of submitting to public regulation and of furnishing reasonably adequate service to all persons at reasonable prices.[6]

As early as 1670, ferryboat operators in England enraged the public by charging exorbitant tolls and providing poor service. Lord Chief Justice Matthew Hale wrote, "Each ferry ought to be under a public regulation, to wit, that it give attendance at due time, a boat in due order and take but a reasonable toll."[7] Chief Justice Waite said in Munn v. Illinois, 94 U.S. 113, 125–126, 24 L.Ed. 77 (1877):

"Looking, then, to the common law, from whence came the [property] right which the Constitution protects, we find that when private property is 'affected with a public interest, it ceases to be *juris privati* only.' This was said by Lord Chief Justice Hale more than two hundred years ago, in his treatise De Portibus Maris, 1 Harg.Law Tracts, 78, and has been accepted without objection as an essential element in the law of property ever since. Property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large."

It is also clear what the common law was in Wisconsin prior to and during the 1866–1871 period. In Shepard v. Milwaukee Gas Light Co., 6 Wis. 526 [539] (1858), the Wisconsin Supreme Court said at pages 534–535 [546–547]:

"The very fact of this exclusive right conferred upon the company to manufacture and sell gas in the city, to be consumed therein by the citizens thereof, would imply an obligation on the part of the company to furnish the city and citizens with a reasonable supply on reasonable terms. . . . Odius as were monopolies to the common law, they are still more repugnant to the genius and spirit of our

---

4. Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 81, 21 L.Ed. 394 (1873), quoted in Mr. Justice Rehnquist's dissent in Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 178, 92 C.Ct. 1400, 1408, 31 L.Ed.2d 768 (1972).

5. The statements in this paragraph are distilled from Wyman, "The Law of the Public Callings as a Solution of the Trust Problem," 17 Harv.L.Rev. 156–73, 217–47 (1904); Burdick, "The Origin of the Peculiar Duties of Public Service Companies," 11 Col.L.Rev. 514–31, 616–38, 743–64 (1911); Barnes, "Government Regulation of Public Service Corporations," 3 Marquette L.Rev. 65 (1918).

6. Burdick, *supra* note 5, at 518: "A person, by holding himself out to serve the public generally, assumed two obligations—to serve all who applied; and, if he entered upon the performance of his service, to do it in a 'workmanlike manner'." Wyman, *supra* note 5, at 166: "Wherever virtual monopoly is found the situation demands this law that all who apply shall be served, with adequate facilities, for reasonable compensation and without discrimination; otherwise in crucial instances of oppression, inconvenience, extortion and injustice there will be no remedies for these industrial wrongs."

7. "De Jure Maris," 1 Collection of Tracts Relative to the Law of England 6 (Hargrave ed. 1787).

republican institutions, and are only to be tolerated on the occasion of great public convenience or necessity; and they always imply a corresponding duty to the public to meet the convenience or necessity which tolerates their existence."

And in 1874, the Supreme Court of Wisconsin, in granting to the state attorney general the remedy of restraining railroads from exacting rates in excess of the maximum fixed by the legislature, said in Attorney General v. Chicago & N.W.R.R., 35 Wis. 425, 530–531, 595:

"But such aggregations of capital and power, outside of the public control, are dangerous to public and private right; and are practically above many public restraints of the common law, and all ordinary remedies of the common law for private wrongs. Their influence is so large, their capacity of resistance so formidable, their powers of oppression so various, that few private persons could litigate with them; still fewer private persons would litigate with them, for the little rights or the little wrongs which go so far to make up the measure of average prosperity of life.

\* \* \* \* \* \*

"And all England had occasion to bless the courage and integrity of her great judges, who used so ably and so freely and so beneficially the equity writ, and held great corporations to strict regard to public and private right. Every person suffering or about to suffer their oppression, by a disregard of corporate duty, may have his injunction. When their oppression becomes public, it is the duty of the attorney general to apply for the writ on behalf of the public.

\* \* \* \* \* \*

"We have held that here is positive violation of positive public law to positive public injury, and that we have jurisdiction of this writ, as a prerogative writ, to restrain it."

A recent exhaustive study of the background and history of Munn v. Illinois demonstrates that the case presented an accurate analysis of the common law treatment of the natural monopolies to which citizens were "compelled to resort" as it existed in the decades of the 1860's and 1870's.[8] The public affectation doctrine of Munn v. Illinois was replaced in 1934 by Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, where the Court declared that the state could regulate and interfere, by virtue of its police powers, wherever the public needed protection. In 1933, the New York legislature had established a Milk Control Board with power to fix milk prices. In upholding the milk price system, the Court observed, "The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry, for adequate reason, is subject to control for the public good." Id. at 536, 54 S.Ct. at 515. The Court distinguished "public utilities":

"We may as well say at once that the dairy industry is not, in the accepted sense of the phrase, a public utility. We think the appellant is also right in asserting that there is in this case no suggestion of any monopoly or monopolistic practice. It goes without saying that those engaged in the business are in no way dependent upon public grants or franchises for the privilege of conducting

8. Scheiber, "The Road To Munn: Eminent Domain and the Concept of Public Purpose in the State Courts," in Fleming and Bailyn, Law In American History 329 at 330–31 (1971). Scheiber notes:
"That certain types of property even if private in their *ownership* were public in their *use*, i. e., 'affected with a public interest,' and thus no longer *juris privati* only, was a concept embedded in common-law doctrines and kept alive in the American courts by a line of cases—many of them, relying heavily on Hale's tracts as the fountain of apposite doctrine—that dealt with riparian and admiralty law, the limits of the police power, and the constitutional conditions surrounding the exercise of eminent domain." Id. at 354–55.

their activities." *Id.* at 531, 54 S.Ct. at 513.[9]

The effect of *Nebbia* was to hold that, while "public utilities" are vitally and essentially "clothed with a public interest,"[10] the public also has some interest in a great variety of other businesses for a multitude of reasons such as the public health, welfare, morality, conservation of resources and fair competition.[11]

It very clearly appears that in the period 1866–1871 pervasive regulation by the state was limited to the natural monopolies, public utilities which enjoyed extensive public privileges and to which citizens were compelled to resort. It was only later that state police powers were extended to encompass the regulation of great varieties of other private endeavors. Thus, regardless of whether or to what extent the "original understanding" of the Fourteenth Amendment and the Ku Klux Act is deemed to limit their present application, that understanding most certainly included coverage of the state-like action then being exercised by public utilities under careful and detailed state control.

The common law emphasis on the monopolistic character of a public interest business has continued to pervade judicial analysis of what constitutes "state action" for purposes of the Fourteenth Amendment and the corresponding "under color" language of the Ku Klux Act. In Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), both the majority opinion and Mr. Justice Douglas in his dissent agreed that the Moose Lodge was not "a place of public accommodation" or a "public enterprise or undertaking."[12] Despite having distinguished a private club from a public enterprise, both opinions are concerned with the monopolistic aspects of the club's liquor license.

9. The Court in effect found that the grain elevators in *Munn* were not "public utilities": "Munn and Scott held no franchise from the state. They owned the property upon which their elevator was situated and conducted their business as private citizens. No doubt they felt at liberty to deal with whom they pleased and on such terms as they might deem just to themselves. Their enterprise could not fairly be called a monopoly, although it was referred to in the decision as a 'virtual monopoly.' This meant only that their elevator was strategically situated and that a large portion of the public found it highly inconvenient to deal with others." *Id.* at 532, 54 S.Ct. at 514.

10. "Plainly the activities of railroads, their charges and practices, *so nearly touch the vital economic interests of society* that the police power may be invoked to regulate their charges, and no additional formula of affection or clothing with a public interest is needed to justify the regulation. And this is evidently true of all business units supplying transportation, light, heat, power and water to communities, irrespective of how they obtain their powers." *Id.* at 534, 54 S.Ct. at 515 (emphasis added).

11. The Court cites scores of such instances of public interest in various businesses, virtually all occurring subsequent to the 1877 *Munn* decision.

12. Mr. Justice Rehnquist in the majority opinion said:

"Far from apparently holding itself out as a place of public accommodation. Moose Lodge quite ostentatiously proclaims the fact that it is not open to the public at large. Nor is it located and operated in such surroundings that although private in name, it discharges a function or performs a service that would otherwise in all likelihood be performed by the State." *Id.* at 175, 92 S.Ct. at 1972.

Mr. Justice Douglas noted it was stipulated that Moose Lodge "does not appear to have any public characteristics," and that its "role as a center of community activity" remains an open question. He stated:

"[A] private club, by definition, is not in the public domain. And the fact that a private club gets some kind of permit from the State or municipality does not make it *ipso facto* a public enterprise of undertaking, any more than the grant to a householder of a permit to operate an incinerator puts the householder in the public domain." Id. at 180, 92 S.Ct. at 1975.

Mr. Justice Rehnquist responded to the Douglas dissent by saying:

"The limited effect of the prohibition against obtaining additional club licenses when the maximum number of retail licenses allotted to a municipality has been issued, when considered together with the availability of liquor from hotel, restaurant, and retail licensees falls far short of conferring upon club licensees a monopoly in the dispensing of liquor in any given municipality or in the State as a whole." *Id.* at 177, 92 S.Ct. at 1973.[13]

The successful attempts of public utilities to exclude themselves from the operation of the antitrust laws has not been on the ground that they are not monopolies, but rather on the basis that their activity is exempt as "state action." In recent antitrust cases where gas companies have charged that practices of electric companies were conspiracies to eliminate natural gas as an energy source competitive with electricity (Gas Light Co. v. Georgia Power Co., 440 F.2d 1135 (5th Cir. 1971), cert. denied, 405 U.S. 969, 92 S.Ct. 1162, 31 L. Ed.2d 244 (1972)), or that offering free underground electric service lines to new home builders in return for "all electric" installations were invalid antitrust "tie-ins" (Washington Gas Light Co. v. Virginia Electric & Power Co., 438 F.2d 248 (4th Cir. 1971)), the electric companies themselves have successfully urged that their acts, as "state action," are excluded from the operation of the antitrust laws in accordance with Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

In *Gas Light Co.*, the court concluded at 440 F.2d 1140:

"[T]he Commission here gave lengthy consideration to each of the practices and rates under attack, and after full adversary hearings ordered them into effect, some with major modifications. Defendants' conduct cannot be characterized as individual action when we consider the state's intimate involvement with the rate-making process. Though the rates and practices originated with the regulated utility, Georgia Power, the facts make it plain that they emerged from the Commission as products of the Commission.

\* \* \* \* \* \*

"Our view is that the *Parker* exclusion applies to the rates and practices of public utilities enjoying monopoly status under state policy when their rates and practices are subjected to meaningful regulation and supervision by the state to the end that they are the result of the considered judgment of the state regulatory authority \* \* \*." [14]

"There can be no doubt, and in fact Washington Gas Light does not argue to the contrary, that the SCC is a regulatory arm of the state, possessing both the authority and powers necessary to qualify under *Parker*. Instead, the gas company argues that even though the SCC was aware of VEPCO's ["underground residential distribution"] activities before 1966, it made no investigations and gave no affirmative approval (or disapproval) of the VEPCO plans, and that VEPCO's conduct was therefore 'individual' and not 'state' action. The argument is not without merit but the conclusion is not inevitable unless one equates administrative silence with abandonment of administrative duty. It is just as sensible to infer that silence means consent, *i. e.*,

13. In Public Utilities Commission v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), the Court relied upon the approval by the regulatory commission after a full investigation, of the practice of piping radio programs into buses, as providing the necessary governmental action. The Court said it did not rely on the fact that the bus company operated a public utility on the streets or that it enjoyed a substanial monopoly. By its mention of these factors, however, the Court indicated their importance in a case where the regulatory agency does not . make an affirmative approval.

14. The court in *Washington Gas Light Co.* went even further and held that administrative "silence" constituted "state action," saying at 438 F.2d 252:

## II.

A Wisconsin public utility is as complete and fully interchangeable a government-substitute as the mind could conceive. A Wisconsin electric company enjoys a state-bestowed, state-protected and state-regulated natural monopoly to which every citizen is compelled to resort. In exchange for its monopoly market and its state-guaranteed return on its investment, it must furnish reasonably adequate service at a reasonable and just charge indiscriminately to all customers within its protected territory, and it must submit to full and complete government supervision both by the state through the Public Service Commission and by the municipality which it serves.

Under Wisconsin legislative enactments, no public utility may extend or render electric service to the premises of a person already receiving such service from another public utility; in other words, every utility operates under a state-fostered monopoly. Wis.Stat. Ann. § 196.495. No public utility shall commence rendering service unless it shall first obtain a certificate from the state Public Service Commission authorizing it to transact business. §§ 196.49, 196.50. Every license, permit or franchise granted by the Commission is an indeterminate permit. §§ 196.54, 196.-55, 196.56.

Every public utility is required to furnish reasonably adequate service and facilities at a reasonable and just charge. § 196.03. It is unlawful for any public utility to charge a greater or less compensation for any service performed by it. § 196.22. If any public utility discriminates by charging a greater or less compensation, it may be penalized not less than $100 nor more than $1,000 for each offense, and its agent or officer so offending shall be fined not less than $50 nor more than $100 for each of-

fense. § 196.60. If any public utility shall give any unreasonable preference or advantage to any person or shall subject any person to an unreasonable prejudice or disadvantage, it may be penalized not less than $50 nor more than $1,000 for each offense. § 196.62. If any public utility shall do any prohibited act, it shall be liable to the person injured thereby in treble damages. § 196.-64.

The Commission is vested with power and jurisdiction to supervise and regulate every public utility and to do all things necessary and convenient in the exercise of such power and jurisdiction. § 196.02(1). It shall have authority to inquire into the management of all public utilities and keep itself informed as to the manner and method in which the business is conducted, and may obtain from any public utility all necessary information. § 196.02(4). The Commission has the right to inspect the books, accounts, papers, records and memoranda of any public utility, and to examine under oath any of its officers, agents or employees. § 196.02(5). The Commission can require a uniform system of accounting. § 196.06. Each public utility must furnish to the Commission reports covering in detail every aspect of its business. § 196.12. All reports and records pertaining to public utilities in the possession of the Commission are open to inspection by the public at all reasonable times. § 196.14. The Commission may value or revalue all the property of any public utility. § 196.05. If the Commission finds that the rates or charges are unjust, unreasonable, insufficient or unjustly discriminatory or preferential or otherwise unreasonable or unlawful, it shall determine and fix reasonable rates and charges. § 196.37 (1).

In regard to the Commission's power and jurisdiction over services, every pub-

---

approval. Indeed, the latter inference seems the more likely one when we remember that even the gas company concedes that the SCC possessed adequate regulatory powers to stop VEPCO

if it chose to do so, and that eventually SCC spoke affirmatively and first modified and finally ended the promotional practices upon which the suit was based."

lic utility shall file with the Commission all rules and regulations which in any manner affect the service or product. § 196.19(2). No change in any utility rate which purports to curtail the obligation or undertaking of service of the utility shall be effective without the written approval of the Commission after hearing. § 196.20. Whenever the Commission finds that any regulations, measurements, practices, acts or services are unjust, unreasonable, insufficient, preferential, unjustly discriminatory or otherwise unreasonable or unlawful, or shall find that any service is inadequate, or any service which can be reasonably demanded cannot be obtained, the Commission shall determine and fix reasonable regulations in lieu thereof. § 196.37(2).

No public utility shall be dissolved, reorganized, consolidated, merged or abandoned without the consent and approval of the Commission. §§ 196.78, 196.79, 196.80, 196.81.

In addition, any public utility shall by the acceptance of an indeterminate permit be deemed to have consented to a future purchase of its property actually used and useful for the convenience of the public, by the municipality which it serves for the compensation and under terms and conditions determined by the Commission. § 196.57. While they remain under private ownership, however, all public utilities are subject to regulation by the municipality which they serve. The municipality has the power to determine the quality and character of each kind of product or service furnished or rendered and all other terms and conditions upon which the public utility may be permitted to occupy the streets, highways and other public places within the municipality. § 196.58(1). The Commission shall have original and concurrent jurisdiction with municipalities to require extensions of

service and to regulate service of public utilities. § 196.58(5).

Finally, the Wisconsin statutes provide that "Any officer or agent of any public utility furnishing or transmitting gas or electric current or both or water to the public or for public purposes * * * may enter any dwelling, store, building, room or place supplied with gas, electricity or water by such utility, for the purpose of inspecting, examining, repairing, installing or removing the meters, pipes, fittings, wires and works for supplying or regulating the supply of gas, electricity or water and of ascertaining the quantity of gas, electricity or water supplied." § 196.171.

This summary demonstrates the intertwining of public regulation with private ownership and, further, the identity of function between a municipality and a public utility.

Where the government places monopoly power in private hands, even in cases where the recipient of the power is not a public utility or a "government-substitute," the Supreme Court has found "state action" (or the concomitant "federal governmental action"). In *Railway Employees' Department v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956), the enactment of the federal statute (Railway Labor Act) authorizing union shop agreements was the "governmental action," since it gave unions monopolistic power over the supply of railroad employees. In *Lathrop v. Donohue*, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961), the Court found state action in the Wisconsin Supreme Court's requirement that an attorney must be a member of the integrated bar association if he wishes to practice law, because a monopoly supply of lawyers was created.[15]

State action is also carried on by private parties who perform a public function ordinarily performed by a govern-

---

15. *See also*, Lavoie v. Bigwood, 457 F.2d 7, 14 (1st Cir. 1972): "[W]e find that appellant has adequately alleged 'state action' in asserting a town purpose to restrict sites for mobile homes and a concomitant private monopoly over the allocation of those sites."

mental agency. In Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), a private corporation which owned a "company town" was held to carry on state action. ("In short the town and its shopping district are accessible to and freely used by the public in general and there is nothing to distinguish them from any other town and shopping center except the fact that the title to the property belongs to a private corporation." *Id.* at 503, 66 S.Ct. at 277.)

Where a state delegates an aspect of the elective process to private groups, they become subject to the same restraints as the state. Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

In Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), a United States senator had willed a tract of land to the city of Macon, Georgia, to be used as a park for white people only. The city kept the park segregated for some years, but in time let blacks use it also. Suit was brought to remove the city as trustee. The city resigned, its resignation was accepted, and the Georgia Supreme Court held that the senator had the right to bequeath his property to a limited class. In reversing, the Supreme Court said at 301–302, 86 S.Ct. at 490:

> "The service rendered even by a private park of this character is municipal in nature. It is open to every white person, there being no selective element other than race. * * * A park * * * is more like a fire department or police department that traditionally serves the community. Mass recreation through the use of

parks is plainly in the public domain * * *. Like the streets of the company town in Marsh v. Alabama, *supra,* the elective process of Terry v. Adams, *supra,* and the transit system of Public Utilities Comm'n v. Pollak, *supra* [343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952)], the predominant character and purpose of this park are municipal."

Restrictive covenants founded in private action serve the same function and have the same effect as zoning ordinances promulgated through governmental sanction and therefore constitute state action. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

Not only is the defendant electric company in this case "accessible to and freely used by the public in general;" not only are its "predominant character and purpose . . . municipal." Wisconsin citizens are actually compelled to use its facilities. And the municipalities which it serves could take over those facilities, if they so desired, and operate them directly. It is difficult to imagine a more thoroughly state-integrated government-substitute than a public utility; the one involved here is a particularly eminent example.

The defendant utility operates as an agent of the state under the supervision and regulation of the defendant Public Service Commissioners, who are jointly responsible for its acts, in satisfaction of the requirements of "state action" and "under color" of state law.[16] It remains to be determined whether the act involved here was an integral part of such state action or was merely a private act by the utility disassociated from its public business.[17]

---

16. Black, "The Supreme Court 1966 Term: Forward: 'State Action,' Equal Protection, and California's Proposition 14," 81 Harv.L.Rev. 69 (1967); Williams, "The Twilight of State Action," 41 Tex.L. Rev. 347 (1963); Van Alstyne & Karst, "State Action," 14 Stan.L.Rev. 3 (1961); Lewis, "The Meaning of State Action," 60 Col.L.Rev. 1083 (1960); Horowitz, "The Misleading Search for 'State Action'

Under The Fourteenth Amendment," 30 S.Cal.L.Rev. 208 (1957).

17. While I conclude in Part III that the state was substantially involved in the disconnect action, an opposite conclusion would not necessitate a holding that the diconnection was a private act. Mr. Justice Rehnquist in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.

### III.

The district court dismissed the plaintiff's cause of action upon the motion of the defendant Public Service Commissioners (in which motion the defendant Wisconsin Electric Power Company joined) to dismiss the action for failure of the amended complaint to state a claim upon which relief could be granted and for failure to state a substantial federal question. Therefore the plaintiff's allegations must be taken as true that: (1) on December 23, 1969, he personally went to the defendant utility's office at 231 West Michigan Street, Milwaukee, and made a payment in cash for his current electrical service charge for his residence located at 2714 West Clybourn Street, Milwaukee; (2) his receipt was not stamped for the payment; (3) the plaintiff continued to make current payments for utilities but refused to pay for the one disputed arrearage; and (4) the utility notified the plaintiff that his electrical service would be discontinued on July 6, 1970.

Although the record here is sparse, it does contain some affidavits and some answers by the defendants to interrogatories. From these it appears that the disputed payment was in the amount of $9.89; that a subsequent charge was made for the premises at 2714 West Cly-

bourn Street and was paid by the plaintiff; that the plaintiff then moved to 3328 West St. Paul Street, where he was charged and he paid at least four monthly statements prior to being notified of the threatened disconnection of his West St. Paul service for failure to pay the one disputed item of $9.89 at West Clybourn.

It has been generally acknowledged judicially that a public utility company or a municipality engaged in supplying gas or electricity to the public has the right to cut off service to a customer for nonpayment by him of a just service bill, and may adopt and enforce, as a reasonable regulation for the conduct of its business, a rule that service supplied to a customer may be cut off because of his default in payment. Annotation, 112 A.L.R. 237 (1938).[18] A reason for the rule "is that to limit the remedy for collection of compensation for the service to actions at law would be impracticable, as leading to an infinite number of actions to collect very small bills against scattered consumers, many of them mere renters and financially irresponsible." Steele v. Clinton Electric Light & Power Co., 123 Conn. 180, 193 A. 613, 615 (1937).

But the present case does not involve nonpayment of undisputed accounts. As

Ed.2d 627 (1972), in his discussion of Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), does not mention any direct connection between the Authority and the restaurant's racial discrimination. Instead, he properly emphasizes the Court's reliance on the multiple links between the government and the restaurant. That discussion and the concern with the monopoly aspects of liquor licensing seem to indicate a recognition that the extent of state involvement might be so great that state action would exist despite only a minimal nexus between the act complained of and the state regulation.

There is substantial authority for such a view. Burton v. Wilmington Parking Authority, *supra*; Lavoie v. Bigwood, 457 F.2d 7 (1st Cir. 1972); McQueen v. Druker, 438 F.2d 781 (1st Cir. 1971); Washington Gas Light Co. v. Virginia Electric & Power Co., 438 F.2d 248 (4th

Cir. 1971); Smith v. Holiday Inns of America, Inc., 336 F.2d 630 (6th Cir. 1964); Colon v. Tompkins Square Neighbors, Inc., 294 F.Supp. 134 (S.D.N.Y. 1968); Anderson v. Moses, 185 F.Supp. 727 (S.D.N.Y.1960).

18. If this were not an established rule, it could well be contested on the ground that it gives a highly favored monopoly another advantage over the ordinary merchant who, when his debtor fails to make payment, must initiate court action to collect. The merchant's threat to stop dealing has no coercive effect since the consumer need only find the next merchant. The public utility's threat to discontinue vital services not available elsewhere is highly effective coercion and totally discourages litigation. *See* Note, "Public Utilities and the Poor: The Requirement of Cash Deposits From Domestic Consumers," 78 Yale L.J. 448 (1969).

the record now stands, the plaintiff's account was paid in full. The defendant utility has threatened to discontinue service if the same account is not paid a second time, which is clearly a discriminatory practice under Wisconsin statutes. Wis.Stat.Ann. §§ 196.60, 196.62. Even assuming that the order to dismiss was vacated and the case remanded for further proceedings, the utility, which contended in its answer that the $9.89 account was not paid,[19] merely created a bona fide dispute as to payment. Neither situation calls into operation the "general rule" regarding discontinuance of service. In fact either situation calls into effect an entirely different rule: "[B]ecause the consumer's dependence on the utility provides it with an overwhelming bargaining advantage, discontinuance can not be used to coerce a customer into paying a bill when there is a bona fide dispute concerning its validity." Note, "The Duty of a Public Utility To Render Adequate Service: Its Scope and Enforcement," 62 Col.L.Rev. 312, 326 (1962). *See* Steele v. Clinton Electric Light & Power Co., *supra,* 193 A. at 615; Annotation, 112 A.L.R. at 241. Additional reasons for this rule are that the alternative enables the utility to pass judgment on its own case[20] and encourages fraudulent tactics.[21]

Therefore, whether the plaintiff's account was paid or payment was in dispute, the threatened cut-off of service by the utility was contrary to the general legal principles governing such conduct. The critical problem, however, is the extent to which the state has insinuated itself into the problems of discontinuance of service where payment is in dispute.

On September 27, 1932, the Wisconsin Public Service Commission, upon prior notice, held a hearing and investigation relative to proposed standard guaranty and deposit rules and disconnect procedure. At the hearing one public utility contested the Commission's authority to establish any rules on the subject on the ground that such rules governed a purely managerial function and were equivalent to confiscation of the company's property. The Commission found that position "untenable." On November 27, 1935, the Commission issued its order effective January 1, 1936, entitled "Re Guarantee and Deposit Rules and Disconnect Procedure," 11 Public Utilities Rep. (New Series) 439 (1935). The Commission said at 443–44:

"The subject which has been the chief bone of contention between the Commission and the utilities is the legal limitations which attach to the privilege of disconnection or refusal of service. Our approach to the subject has been that, under modern conditions, light, heat, power, water, and communication service are prime necessities of life, any one of which may vitally affect the health, business, or

19. The district court in its opinion said: "In effect, the plaintiff complains of the refusal of the Wisconsin Electric Power Company to extend credit." Lucas v. Wisconsin Electric Power Co., 322 F. Supp. 337, 339 (E.D.Wis.1970). This is not what the plaintiff complains of at all. One who contends that he has paid all his bills is not seeking credit.

20. Steele v. Clinton Electric Light & Power Co., 123 Conn. 180, 193 A. 613 (1937).

21. In Wood v. City of Auburn, 87 Me. 287, 32 A. 906, 908 (1895), the Supreme Judicial Court of Maine, in enjoining the shutting off of water because of a disputed bill, said:
"The city, as a water company, cannot do as it will with its water. It owes a

duty to each consumer. The consumer, once taken on to the system, becomes dependent on that system for a prime necessity of business, comfort, health, and even life. He must have the pure water daily and hourly. To suddenly deprive him of this water, in order to force him to pay an old bill claimed to be unjust, puts him at an enormous disadvantage. He cannot wait for the water. He must surrender, and swallow his choking sense of injustice. Such a power in a water company or municipality places the consumer at its mercy. It can always claim that some old bill is unpaid. The receipt may have been lost, the collector may have embezzled the money yet the consumer must pay it again, and perhaps still again. He cannot resist, lest he lose the water."

comfort of the customer. Certainly no one should be deprived of such services except for just and sufficient cause. As has been frequently pointed out by the courts, a customer after having subscribed to any of the above services becomes wholly dependent upon the utility and thereby places himself at an enormous disadvantage. Since the parties are not on an equal footing, the privilege of disconnecting or refusing service constitutes a powerful weapon which, if arbitrarily or capriciously exercised, may be used to coerce a customer unduly. In short, it is a privilege which should be exercised with extreme caution and only to insure compliance with requirements which are both equitable and enforceable at law.

"In connection with this principle, the supreme judicial court of Maine in Wood v. Auburn (1895) 87 Me. 287, 293, 32 Atl. 906, 29 L.R.A. 376, one of the leading cases on the subject of disconnection, said in answer to the contention that the customer may apply to the courts to recover any sum he was compelled to pay under threat of disconnection: 'To oblige a person to follow such a course would be a violation of the fundamental juristic principle of procedure . . . that he who asserts something to be due him, not he who denies a debt, shall have the burden of judicial action and proof.'

"It is our belief that the primary function of a disconnect rule is to assist utilities in collecting legitimate bills for utility service without resorting to a court of law. Various utility representatives have pointed out, and the Commission concedes that the cost of attempting to collect small accounts in the courts is prohibitive. Furthermore, such suits may put customers to undue expense. We are of the opinion, therefore, that the privilege of disconnection should be considered as a technically extra-legal remedy to be invoked by the utility only to enforce its legal rights without resort to a court of law. It should not be used, as it has been too frequently in the past, to compel a customer to pay up a delinquent account within an unreasonable period or to impose other unreasonable or burdensome conditions which are not warranted by the facts in the case."

The Commission then proceeded to set forth nine "principles and interpretations" including the following:

"6. Service may not be denied at one location because of the customer's failure to pay a bill at a previous location. . . .

"7. Service may not be denied at the same location to a customer who has paid the current bill but who has some old delinquent bills still owing to the company. . . ." (*Id.* at 445.)

Each of the "principles," including the above two, was supported in the order by the citation of numerous cases. The Commission concluded, "With the foregoing principles and interpretations in mind we believe that the following rules should be adopted as a guide for future action along these lines." *Id.* at 446. A separate rule was set forth for deposits, guarantee and disconnect. The presently existing rule covering these subjects is substantially the same as the one in the 1935 order of the Commission; apparently it has been modified slightly from time to time by subsequent Commission orders. 6 Wis.Adm.Code, ch. PSC § 113.13.[22]

It is beyond dispute that the state through the Commission has insinuated itself into the entire problem of dis-

---

22. The present codification of the rule does not expressly include the nine "principles and interpretations;" presumably they remain in effect as guidelines. Therefore, even if the plaintiff did not pay the disputed account, guidelines 6 and 7 dictate that the defendant utility should not threaten to discontinue service. Whatever the facts are, the utility's threat to discontinue his electric service is unlawful because it is based on an old account at a different location.

connection by virtue of its 1935 order. In addition, the Wisconsin legislature, by investing the defendant utility with the power and authority to enter into the plaintiff's dwelling to remove the "meters, pipes, fittings, wires and works for supplying or regulating the supply" of electricity has become a joint party with the utility in resorting to self-help procedures which are subject, as in this case, to abuse and to the opportunity for unlawful trespass. Whether it is possible for the utility to accomplish the discontinuance of service by throwing a switch before or after the self-help trespass is not a detail which would affect the impact of the state's activity in permitting it.

I would hold that there is sufficient state action to give the federal court jurisdiction under the Fourteenth Amendment and that all the defendants acted under color of state law for purposes of jurisdiction under section 1 of the Civil Rights Act of 1871 (Ku Klux Act, 42 U.S.C. § 1983).[23]

## IV.

The next question is whether the rules governing disconnection of electric service promulgated by the defendant utility with the tacit approval of the defendant Commissioners resulted in a deprivation of plaintiff's liberty or property without due process of law in contravention of the Fourteenth Amendment and 42 U.S.C. § 1983.

It has now been established that 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3), apply to property rights as well as does the Fourteenth Amendment by its terms. Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424

(1972). Although such items as a stove, a stereophonic phonograph, a table and a bed are "deserving of due process protection," Fuentes v. Shevin, 407 U.S. 67, 88, 92 S.Ct. 1983, 1998, 32 L.Ed.2d 556 (1972), "the requirements of due process should be more embracing" when an absolute necessity of modern life such as electricity is involved.[24] See Lindsey v. Normet, 405 U.S. 56, 89, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (Douglas, J., dissenting in part).

"For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must be notified.' Baldwin v. Hale, 1 Wall. 223, 68 U.S. 223, 17 L.Ed. 531, * * * It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.' Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62." Fuentes v. Shevin, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972).

I agree with Judge Stevens' approach that due process must be assessed only after a consideration of the remedies currently available to the plaintiff, but I disagree that what is available satisfies due process or even remotely approaches it. The majority opinion suggests three possible judicial remedies, all of which require the customer to take the initiative: (1) equitable remedy of injunction; (2) payment under protest and suit for refund; and (3) remedy at law for damages.

In regard to equitable relief, it has been noted above that the Wisconsin Supreme Court held as early as 1874 that

---

**23.** However, inasmuch as a "note" to PSC § 113.13(4) provides, "Some utilities have rules or practices that are more liberal to customers in some particulars than the rules enumerated above," I would agree with Judge Stevens that the rules at issue here are not of state-wide application. Hence a three-judge court was not required to be convened. Board of

Regents v. New Left Education Project, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972).

**24.** In 1935, the Wisconsin Public Service Commission described electricity as a "prime necessity of life." Re Guarantee and Deposit Rules and Disconnect Procedure, 11 Public Utilities Rep. (New Series) 439, 443 (1935).

the state attorney general could procure an injunction against an offending public utility since private persons could and would not do so as individuals "for . . . the little wrongs which go so far to make up the measure of average prosperity of life." Attorney General v. Chicago & N. W. R. R., 35 Wis. 425, 530–531 (1874). In the present case, the attorney general has not come to the plaintiff's aid.

Later the Wisconsin Supreme Court said in Pabst Corp. v. City of Milwaukee, 193 Wis. 522, 527, 213 N.W. 888, 890 (1927):

> "For the small consumer the cost of such a proceeding in equity [for an injunction] would be so out of proportion to the amount involved to be prohibitive. To hold that a public utility supplying an absolute necessity of modern urban life can compel a consumer to pay excessive and illegal rates under a threat of depriving the consumer of the service and then defeat recovery for the excess illegally collected because the consumer has not resorted to a suit in equity 'would be a violation of the fundamental juristic principle of procedure. That principle is that the claimant, not the defendant, shall resort to a judicial process; that he who asserts something to be due him, not he who denies a debt, shall have the burden of judicial action and proof. It is only in the case of dues to the state that this principle is suspended.' Wood v. Auburn, 87 Me. 287, 293, 32 A. 906, 908, 29 L.R.A. 376–378."

Not only did the Wisconsin Supreme Court in its opinion in *Pabst* discuss the unequal battle between utility and customer, which renders it inequitable to place the burden on the individual to initiate court action at law or equity. It also, as noted in the quotation from *Wood,* concluded that the requirement of payment under protest is limited to payment of revenue to the state.

The authority that a public utility has no lawful right to discontinue service for nonpayment of a disputed account, or an account for a different location or an older account when a current account has been paid, lends no support to a theory that a public utility has the right to reverse the principles of burden of judicial action, whether at law [25] or in equity.

In Fuentes v. Shevin, 407 U.S. 67, 81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972), the Court discussed the seizure of goods without notice or hearing, which is no different than the seizure of electric power:

> "At a later hearing, an individual's possessions can be returned to him if

---

25. As an example of an aggrieved customer's remedy in tort for damages, Judge Stevens has cited the last *Shepard* case in Wisconsin (footnote 23 of majority opinion). Shepard was a hardware merchant in Milwaukee who in December, 1856, caused his shop to be fitted with gas apparatus and fixtures. He demanded to be supplied with gas but was denied service because he refused to sign a contract containing the gas company's regulations, to some of which he objected. Shepard sued the gas company and recovered a judgment for $100 and costs. The gas company appealed to the Wisconsin Supreme Court, which agreed with Shepard that several of the regulations were improper and affirmed. Shepard v. Milwaukee Gas Light Co., 6 Wis. 526 [539] (1858). The company continued to deny Shepard service, however, and he brought another suit for damages. The lower court nonsuited him for failure to file a written application (which contained the invalid regulations). He then appealed to the Wisconsin Supreme Court, which reaffirmed the invalidity of the regulations, held that under the circumstances a written application had been waived, set aside the nonsuit and ordered a trial. Shepherd [sic] v. Milwaukee Gas Light Co., 11 Wis. 243 [234] (1860). Trial was had and Shepard recovered judgment on a jury verdict for $1500, which was appealed by the gas company. The Supreme Court affirmed in Shepard v. Milwaukee Gas Light Co., 15 Wis. 349 (1862). In 1862 he recovered damages for 1857 and 1858 in the total amount of $1600 after three appeals to the Wisconsin Supreme Court, during which time Shepard's customers hunted for nuts and bolts by candlelight.

it was unfairly or mistakenly taken in the first place. Damages may even be awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred."

The only complaint provided against public utilities by consumers at the administrative level must be initiated by at least 25 persons. Wis.Stat.Ann. § 196.26. This is comparable to the administrative remedy held inadequate in McNeese v. Board of Education, 373 U. S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), where 50 residents of a school district or 10 percent, whichever was less, could file a segregation complaint with the state superintendent of public instruction. Certainly, the investigation the Commission "may on its own motion" make (§ 196.28) or the defendant utility's informal procedures for dealing with complaints cannot be said to satisfy procedural due process. The right to an impartial judge—one who has no interest in the outcome of a case before him —is required to meet the minimum standards of due process. In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); Tumey v. Ohio, 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927).

In Shepard v. Milwaukee Gas Light Co., 6 Wis. 526, 537 [539] (1858), the Wisconsin Supreme Court in determining the invalidity of a gas company's regulation said:

"Another regulation . . . reserves to the company the right at any time to cut off communication of the service pipe, if they shall find it necessary to do so, to protect the works against abuse or fraud, either in fact or in anticipation, without notice, without trial, of their own mere motion. This summary jurisdiction would not be given to any of the judicial courts in any case, but upon the most urgent emergency. Much less could it have been the intention to confer such power upon one of the parties to a contract of such vital importance. It is no hardship for the company to resort to the same tribunals, upon like process, for protection against fraud, as the law provides for individuals."

Due process tolerates variances in the form of a hearing "appropriate to the nature of the case," Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), and "depending upon the importance of the interests involved," Boddie v. Connecticut, 401 U.S. 371, 378, 91 S. Ct. 780, 786, 28 L.Ed.2d 113 (1971). I would hold that, prior to the discontinuance of power because of a disputed account, the disputant is entitled to some kind of hearing before an impartial arbiter other than representatives of the public utility.

I would also hold that some notice reasonable in time and adequate in content must clearly advise the customer that he has the right to such a hearing if he disputes the charges leading to the threatened disconnection.[26] If he indicates his desire for the hearing, obviously he would be entitled to further reasonable notice as to the time and place of the hearing.

The defendant utility is not infallible. It admitted to 646 errors during a recent calendar year. There is no reason why the present preliminary informal negotiations between utility and customer which unearthed these errors would

---

26. The five-day "notice of disconnection" in the present case did not, in my opinion, serve any meaningful notice requirement. Notice must be of a hearing, not of disconnection. Nor would I require that the customer "be presumed to know the law." The notice should tell him what the pertinent law is. Recently the Supreme Court looked with disfavor upon taking advantage of "an uneducated, uninformed consumer with little access to legal help and little familiarity with legal procedures." Fuentes v. Shevin, 407 U.S. 67, 83, 92 S.Ct. 1983, 1995, 32 L.Ed.2d 556 n. 13 (1972).

not continue if notice and hearing were required prior to threatened disconnection. Despite the 10,000 service disconnections by defendant utility each year, in a recent calendar year only 71 persons went so far with their disputes as to contact the Public Service Commission, the Better Business Bureau, a newspaper or a public utility officer. It is not likely that a much larger number would take advantage of a proffered hearing. In those cases, perhaps everyone would benefit from the uniform procedure.[27]

On the other hand, the small amount involved and the relatively small number of persons who may be confronted with a situation similar to plaintiff's does not cause the problem to disappear. The likelihood of error in complex operations,[28] the increasing probability that a letter containing a check to pay a bill may be lost or stolen, the venality of employees and even honest differences of opinion make this not only a very real problem[29] but one with which greater numbers of persons are unable intelligently to cope.[30] *See* Ihrke v. Northern States Power Co., 459 F.2d 566 (8th Cir. 1972); Palmer v. Columbia Gas Co., 342 F.Supp. 241 (N.D.Ohio 1972).

Finally, I believe that this is a proper class action[31] and that it is not barred by the Johnson Act, 28 U.S.C. § 1342, since its possible effect on public utility rates is purely incidental to the constitutional issues involved.

In conclusion, I would reverse the district court and enjoin this and similar disconnections or threatened disconnections based upon disputed accounts, unless and until the customer was provided with adequate and reasonable notice and a hearing before an impartial arbiter.

---

27. There is no reason why the daily newspaper "action" columns and the few selected readers whom they serve should have a monopoly on prompt, fair treatment.

28. The *defendant* utility disavowed any "computer error" among its 646 annual errors "due to human agency." Of course from one viewpoint, a computer is incapable of error; only the computer operator makes errors. Nor can anyone know how many errors go undetected in the course of a year.

29. *See, e. g.,* the New York Times, June 28, 1972, page 33, article entitled "Phone Deposit and Cancellation Policies Are Scored at Hearing."

30. In contrast to the pleasant treatment impliedly reflected by the description of the theoretical method of handling complaints within the utility and Commission, there are almost daily items recounting slightly more abrasive handling of actual complaints. *See, e. g.,* Chicago Today, May 2, 1972, page 4.

31. Miller, "Problems in Administering Judicial Relief in Class Actions under Federal Rule 23(b)(3)," 54 F.R.D. 501, 504–505 (1972).